Good morning. Good morning, Your Honors. Britton Sparkman, Charleston Co. PC, on behalf of Plaintiff Appellant Bunker Holdings. May I proceed? Please. Your Honors, I'd first like to address the Second Circuit Authority, which was filed on the docket yesterday by Defendant Apelli. The Tamera, ING Bank v. Tamera decision issued on June 13th. That case has limited applicability to this pending appeal, and in fact, all of the authority that's been coming down from district courts and circuit courts around the country have limited to no applicability to the pending appeal because of one very important case, which is still the binding precedent of this circuit, the Kinlucky decision. Well, let's outlier, isn't it? I don't, I don't agree, I don't agree, Your Honor. The reason why is because the court set forth, in that case, two very distinct manners in which a physical supplier, such as Bunker Holdings, could establish its entitlement to the maritime lien. The first was through the origination of the order of the necessaries, in this case Bunkers, from someone authorized to do so. All of the decisions from the Second Circuit, the Barcliffe decision in the Eleventh Circuit, the various district court decisions, have focused on something that's not actually in dispute, i.e., that in the Ninth Circuit, there was an agreement, there was an admission that Bulkfertz originated the order. In that case, in Kinlucky, Bulkfertz was the sub-charter of the vessel, and so the Maritime Lien Act at the time, a sub-charter could incur a lien on the vessel. But, counsel, isn't the real key here, though, that in Kinlucky, the Marine Fuel was notified, and I'm quoting, that it had been nominated by the owner of the Kinlucky to supply the vessel. There you have a direct delegation of authority, a nomination. You don't have that here, you just have the general contractor rule, do you not? You don't, Your Honor. Two things I would say about that. One is the fact that that was a telex received from someone that was in a similar position to O.W. Far East in this case. We don't have any actual record that that was Bulkfertz or the owner which provided that notice. But the court treated it as if it were a direct authorization, did it not? The court did reference that, that it was an authorization. Here, there was also an authorization. What authorization was that? The authorization came from the actual owner of the vessel. It wasn't an additional step removed from a charterer. Yang Ming, through its managing company, Yang Ming Transport, authorized O.W. Bunkers to arrange for the supply of bunkers to the YM Success. But isn't that the general contractor issue that I mentioned a few moments ago? I think the distinction, Your Honor, is that in the general contractor line of cases, you have a general contractor that's hired to do a certain service or necessaries to a vessel. And in those cases, whether it's the Port of Portland from 1989 from the circuit or Farsteel II, the actual liens that were attempted by the subcontractors that were dismissed for failure to establish the were not actually ordered on the authorization of the owner of someone with the ability to do so. I'm having difficulty following your logic, counsel. Your client, not your client, but O.W., in this case was a general contractor. They were asked to get some fuel. They weren't told who to get it from, what it would cost, etc., etc. That was up to them. They had a series of transactions that they entered into. I think there are like four or five additional people involved, including, of course, your client. But the order came from them. It didn't come from the owner of the vessel, did it? In this case, Your Honor, there were only three parties. There was Yang Ming, the owner of the vessel, O.W.B. Far East, and then our client, Bunker Holdings. Okay, what I'm referring to, there were, you had to get some people in Russia, and you got some other people in the interim, and so on. I'm including everybody. I realize the main parties are three, but the reality is there was nobody from Yang Ming that said, Bunker, service this vessel. We want so many gallons of bunker fuel, and we'll pay X for it, did it? Your Honor, there's not that exact directive. There's never in these types of cases, because of the way that bunker supplies are handled. And that's the reason why we have the general contractor rule. You don't get liens if you're a general contractor, unless you have an express direction, an express authorization from the owner of the vessel. And I don't see that here. What am I missing? Your Honor, I think that what is key to this case is the fact that they're in the record, established in the record at the district court. There's several references to how this supply was actually going to take place. The first of which is Yang Ming's supplier, or authorized representative, who ordered the bunkers from the supply team and general affairs of Yang Ming Transport, Mr. Alan Wang, directed OWB Far East to arrange for the bunkers. OWB Far East sent through a series of correspondence an actual confirmation, which said that the bunkers would be in the port in Russia, by an identified supplier. And that's at the record at 115 and 124 through 125, that'll be supplied by TransBunker, and identified on that document that ISS would be the local port agent. Where's bunker referenced? TransBunker holdings referenced? Yes, Your Honor, it's unfortunately a little more attenuated. It's not more attenuated, TransBunker is a group which has many companies as part of the group. So bunker holdings is TransBunker, for the purposes of the fact that TransBunker is a trade name. On the correspondence between OWB Far East and bunker holdings, the email addresses are bh at TransBunker dot com. I don't want to take my colleagues time here if they want to weigh in on it, but let me just tell you my personal issue. I looked at the 11th Circuit case in Barcliffe, I looked at the Second Circuit's case from, well actually yesterday, in Bank V, NV, and it seems, of course they're dealing with the same insolvency of OW worldwide, and it seems like the facts are substantially identical. And to the degree they deal with them at all, everybody criticizes the Leckie case, they say it's an outlier, unusual facts, and they all fall back on the general contractor rule. Why isn't the reasoning of the Second and the Eleventh Circuit one that we should adopt, well not adopt, it's our rule anyway, but apply in this case? Two reasons. One, I believe that they were not bound by the precedent of Ken Leckie. So even if... Of course they aren't, I'm just saying they Right, and understand the criticism, but the fact that this circuit does not have the same, has not taken the same approach as the Second and the Eleventh, and even the Fifth Circuit in the Lake Charles-Stevadorian case, with respect to an explicit requirement for the owner of the vessel or the person with the ability to bind the vessel, to specifically select the, if you want to call him a middleman, or the actual physical supplier. Here there's another element to Ken Leckie, which is still good law in this circuit, and was not which was the fact that the master has the ability to endorse the fact that this lien occurred, and that these bunkers were supplied on the order of the owner. The master has that implied authority, and here in the record we had several items which demonstrate an acknowledgement and notice to the vessel, to the vessel's agent, its master, and chief engineer, including but not limited to the actual bunker delivery receipts, which had the terms and conditions incorporated into them. We also had a series of documents which are required under Russian Port Authority documents, identifying that the bunkers were being provided on order of the owner, and were signed for by the master. Are you arguing an implied authority? That you're arguing that OW had implied authority to bind the vessel? No, Your Honor, I'm not arguing that OW, I do believe that the first part of Ken Leckie stands for that proposition, because in that case you had Bulkforts, which engaged two series of traders, who then engaged the ultimate physical supplier, Marine Fuels in Tampa, to provide bunkers to the vessel. So that is one part of it, and understood what Judge Smith has articulated with the fact that the other courts have come down and said, well Ken Leckie is, that's all fine and well, but we're not following that. There's a second aspect to Ken Leckie, which the other circuits have not addressed. They've not addressed it in any substance, they haven't rejected it or said that it's an outlier, and that is the fact that the master of the Ken Leckie, the master of the Ken Leckie in that case, had the authority to bind the vessel. Here, the master of the YM Success and the chief engineer, who signed for all the documentation, saying that they were going to receive the exact bunkers that were ordered by the owner of the vessel. It was a certain quantity that the owner directed, it was a certain type of fuel that the owner directed. The only thing that they didn't specifically direct was who was going to provide that. But they had notice that it was coming from the trans bunker group, and they had an express and implied notice that it was certainly not coming from OWB Far East, which was located in Singapore, when this vessel was going to one of three So, this is a new argument from my perspective. Are you saying that the officers on the Yang Ming itself, when they unloaded the bunker fuel in Russia, authorized the fuel because they took it on the vessel? Is that what you're saying? I'm saying that that's what authority from this circuit allows. Which is, Ken Leckie again? Yes, Your Honor. Doesn't Port of Portland distinguish that? Our case, Port of Portland? Right. Well, Port of Portland does make a distinction, but it was a factual distinction that wasn't present in Ken Leckie or here. In that case, there was actually a factual identification by the Ninth Circuit that there was no direct contact between the officers and the Port of Portland for the purposes of the Port of Portland that decided to take that risk to allow the vessel to remain there without investigating whether or not the payments that it was receiving should be applied to the particular vessel. There's a lot of distinctions between that case. Did you argue this before the district court? Yes, Your Honor. Specifically, I'm talking about the fact that the officers... That the master... The master on the ship, by signing for the fuel, basically circumvented all of the general contractors and everybody. It's just the same as he went to a gas station and, you know, filled up his ship. Is that what you're saying? Not quite, Your Honor, because I think you actually need the factual predicate of the fact that there was an order that originated from the owner. The master would have that authority in a situation where there was no contract whatsoever. If it was something to save the crew or the vessel or the cargo, that could happen. Here, they go hand in hand. I would like to reserve a couple of minutes... I have one question. Are you saying notice equals authority? Is that basically what you're saying? I'm sorry, Your Honor. That notice equals authority? No, I'm not saying that notice equals authority, but that the notice is enough under the facts of this case to establish that everyone involved in the transaction knew that these bunkers were being supplied by bunker holdings through its agent in Russia. Okay. You want to save the balance of your time? Yes, Your Honor. So, we'll hear from Ms. Holland. Good morning. Good morning. May it please the court, I'm appearing on behalf of the Motor Vessel YM Success and the claimant, Yang Ming Liberia Court, pursuant to Rule E8. And I'm delighted that bunker holdings began with the Second Circuit opinion. In the world of maritime law, we are often referring to cases from 10, 20, 30, even 100 years ago. Those are our citations. And it very rare in my world that we actually have a case on point that is issued the day before oral argument. Clearly, we disagree that this case is not applicable here. In fact, it is right on point. We had cited to the district court opinion in our briefing two years ago, what the Second Circuit did was to affirm the district court's decision denying a maritime lien claim from the supplier, SEPSA, because it could not satisfy this third requirement of the Maritime Lien Act. The court has seen the opinion, which we submitted yesterday. In the case at Barr, Judge Settle correctly stated and applied the rule in the Ninth Circuit. And what he said, this put, to obtain a maritime lien against the YM's success, bunker holdings must demonstrate that either OW Far East was acting as an agent for Yang Ming or that Yang Ming directed OW Far East to engage bunker holdings as the specific subcontractor to supply the Nakatka fuel. Counsel, I think you well articulated in the briefs the general contractor rules and the like. The one fly in the ointment, if you will, is the Ken Luckey case. Your opponent has relied almost exclusively on that. Would you like to give us your best reading as to why Ken Luckey should not control in this case or have no bearing as far as the outcome? Certainly, Your Honor. As numerous courts since Ken Luckey have acknowledged, the Ken Luckey case turned on the facts of the case. It turned on the admission by the vessel interests that the lien claimant, Marine Fuel, had sold the fuel to the vessel's sub-charterer. And we know under the specific statement of the Maritime Lien Act, under the specific terms, I should say, that a sub-charterer is one of the parties presumed to be able to bind the vessel. There's no need to then look to agency. And that's what the court said. That's what this court said. This court did not throw out the agency requirement. This court said it was unnecessary. I can pull up the language, actually. The court said it was unnecessary for Marine Fuel to establish agency because the appellees had already admitted that the fuel and bunkers were sold to Bulkfirst, the sub-charterer. So in that case, the admission by the vessel interests established the third element of the Maritime Lien Act. And there was no reason to then have to look to agency. But to read Ken Luckey the way that bunker holdings would read it, it would read the agency requirement right out of the act. And if that's what this court intended to do, it would not have used the agency language that it used in the Port of Portland case the following year. And in fact, in Ken Luckey itself, it refers, there's a statement, we look to principles of agency to interpret the act's reference to agents. And bunker holdings cannot fit under any of the presumed categories here, the parties that are presumed. So they have to be able to establish agency or, as a subcontractor, as Your Honor has noted, there's also the additional exception that we have seen in the cases, which is, if in fact it's specifically nominated, if the vessel owner says, you, O.W. Bunker, go out and hire this particular fuel supplier. And there is no evidence, as I understand it, in the record that O.W. expressly engaged bunker holdings to provide fuel for this vessel, is that right? That the vessel owner did not expressly direct O.W. That's correct, Your Honor. As far as the vessel owner was concerned, it really didn't care where the fuel comes from. And in fact, what it did was to ask O.W. Bunker to provide fuel in Russian ports for a several month period of time. That was the contract that was entered. And then when the specific ship was identified that needed fuel on these particular days, it then goes through the normal paces of requesting that that fuel be delivered. But none, I would disagree with Mr. Smartman that there is any reference anywhere to bunker holdings. Is there anything in the record that suggests that the requirement of the vessel owner to supply fuel in several Russian ports over a period of time that it applied to more than one potential vessel? Or was it always this specific, the YM-Success vessel? Well, the original correspondence was about, as I mentioned, a period of time and what other, whatever Yang Ming vessels would require fuel. That's a significant issue, is it not? If the request for proposal or request for the specific requirement was not even limited to this vessel, but rather it was for a period of time in Russian ports for any of its vessels, would that not make a difference in this particular case, even if we didn't have the general agency rule? Well, it does, Your Honor. I mean, certainly there is subsequent to that a specific request for fuel for this vessel in a particular port on a particular date and a particular price is agreed upon. But there is, I would disagree that there is any knowledge, and in fact the undisputed facts show that Yang Ming had no knowledge whatsoever of bunker holdings involvement in this transaction. And in fact, none of the documentation refers to bunker holdings. None of the documentation that was provided to Yang Ming. And trans-bunker, by the way, that is not a fact that's in the record. In fact, bunker holdings attempted at the last moment to insert that fact into a brief in the lower court, and Judge Settle struck it from the record. So there is no evidence of any kind of connection or agency there. And in fact, there was no reference to bunker holdings throughout all of the facts that are undisputed in the district court. With respect to the conversation that you had regarding the receipt of the of the fuel by the chief engineer or master, by the vessel itself, this particular issue is actually well covered by Judge Caproni in the Clear Lake shipping case, which is also one of the many consolidated cases under appeal in the Second Circuit. But in that particular decision, which is at 239 F sub 3rd 674, and this is at page 689, she addresses this claim that is made by many of the physical suppliers in those cases. And what she says is, this does not establish a direct relationship between the suppliers and the vessels. All of these interactions, receiving the fuel, actually having the hose come up to the ship and signing a bunker certificate, or a bunker receipt, excuse me, concern the performance of existing obligations of OW and physical suppliers. None of these communications purport to bunker holdings finds itself in a difficult position here because it does not even sit in the in the position of one of these physical suppliers. The party and the barge that brought the fuel to the OWYM's success was Baltic Traders. It was not bunker holdings. Bunker holdings was an association of the physical suppliers in the other cases that are unsuccessfully trying to establish a lien based on the argument that bunker holdings made here this morning. Bunker holdings can't even claim to be that party. So putting aside for a moment the the Clear Lake shipping case, the only way that the argument, from your perspective, the argument that opposing counsel has made about the actual receipt of the fuel would be if the Russian company that actually supplied the fuel made the claim. Is that a fair statement? Because bunker holdings itself didn't actually deliver the fuel. Well, as I pointed out, it's there are, they are even further removed. In fact, those physical suppliers, the Baltic Trader making the claim, that does not satisfy the Maritime Lien Act either. You know, dollar-wise I recognize that the cost issue is not the biggest issue in the case, but would you mind speaking to that for a bit? Certainly. We're talking about the award of costs to my client, certainly. The district court had broad discretion to award costs and the local civil rule... Just to help me with the authority question, right, whether the district court had authority to award these types of costs from a statutory standpoint, right? I recognize that the local rule purports to grant the authority, but I'm talking about that local rule doesn't, right, you have to have a statute, an underlying statutory source of authority for that. And that's where I'm having a little trouble, so maybe you can direct your comments to that. As we set forth in our brief, it was docket 47, our supplemental brief, the courts have repeatedly held that 28 U.S.C. 1920 does not prohibit costs covered by a local rule. And as we also noted, a local rule with the authority from the Supreme Court that the Western District of Washington had to create this local rule, that was later in time than 1920. And in fact, if inconsistent, would apply here. And in fact, by specifically stating that the court shall, I think I have the rule here, the court shall... In taxing costs, the following rules shall be observed, and that the specific provision we applied here, reasonable premiums paid on undertakings or bonds or security stipulations, shall be allowed. And we know under the rules and under the statute, the federal statute on costs, that the award of costs is favored and there is wide discretion and latitude, particularly in admiralty cases. Well, okay, maybe admiralty cases are a special situation, but just as a general matter, what you said earlier I don't think is correct. The Supreme Court and our court have made very clear that unless costs are listed in one of the six or so subcategories in 1920, they may not be awarded under Rule 54D, period. That in other words, the cost, the term cost as used in 54D is defined by what's in 1920 exclusively. And obviously, these, the costs that your client were, you know, were awarded here are not listed in 1920. So that's the initial problem I have. Now, is there some special rule that governs in admiralty cases that says, maybe unlike regular civil cases, there's just, I don't know, that's what I'm, you're the expert on that and I'm wondering if you can enlighten us on just how things work in the admiralty world perhaps. Well again, is there a special rule? No. But there is wide latitude and it is what the cost we are talking about here is, this is the practice in maritime lien ship arrest cases, well known, that letters of undertaking are posted to allow for the release of the ship. And if we're going to say, unless we're going to invalidate the local rule and say that the court can't follow its own local rule. Which we could. If it's not supported by statutory authority, that's not, that's shocking an outcome, it seems to me. But, I'm sorry, you finished what you were doing. Right, right. I mean, but that is not the where we currently stand and in fact it is reasonable because what happened here is that the, in order to, in fact it benefited Bunker Holdings that it didn't have to pay custodial costs for a year and a half to get this ship released. So we have a meritless arrest of a ship, it's tied up for a year, excuse me, for a week between Christmas and New Year's, which already has cost millions of dollars to the vessel owner. When it's released, it is, this follows normal procedures in the industry to post a letter of undertaking from a international PNI club, which in fact, contrary to what was argued by Bunker Holdings, in fact is considered very good security and you would be more worried about a ship that could not obtain such a security to get the ship released. And so here, this is the cost and it was a reasonable cost because it was actually less than the premium. No one's disputing that, or at least I don't think that's disputable, but so are you saying that it is a routine practice in district courts across the country that when a ship owner takes out any kind of a security to get the vessel released that that is a cost, the cost for the premiums or the letter of undertaking, that that is awarded as a cost? I can't speak to that, Your Honor, because I don't know about the other local civil rules. I only know that here in the Western District of Washington that is part of our local civil rule and we can in fact receive the, as a cost, the security. Just to be just to be sure, following up on Judge Watford's question, had no letter of undertaking or a behind-the-scenes alternative been posted and the ship was there for a year and a half, would bunker holdings be liable for all of the costs related to that stay by the ship and the related costs? So during the the time that a ship is tied up, if it's not sold at auction, the party that arrests it is paying, is advancing the custodial costs to the substitute custodian, to the, for the for the birthing, for for everything and then what they try to do is recover that at the end of the case should they win. Right, but otherwise, otherwise the arresting party in this case, bunker holdings, would bear all of the costs related, which would be, I gather, potentially many times greater than the cost of the letter of understanding. The letter of undertaking was just what we're we claimed was the interest that we incurred by virtue of having to post the collateral to get that undertaking from the P&I Club, which was approximately $55,000 for the period of time that the that the case was pending before the order was issued. If you think that a plaintiff has wrongfully arrested your ship, you can bring a separate action against them to recover the all of the damages that that like the week's time of you lost use of the ship, but in addition, wouldn't you recover the cost of having to take out the letter of undertaking as well? That's why it seems to me that would be the right way to try to recover this cost, not maybe through 54d. It is akin to to begin a whole new lawsuit and to, in terms of what it takes to prove wrongful arrest, that's a different calculation, if you will, than what are the allowable costs here when we were brought in, had to defend this arrest, when in fact a maritime lien did not exist. And as in costs in any case, you know, we don't get back our attorney's fees, we don't get the costs along the way, but these are the few things that we are allowed by the court, in this case by the local civil rule. Following up on this, in an action for wrongful arrest, which I gather is what it's called, could you recover your attorney fees and what are denominated costs here as well as other related expenses of the ship being tied up at the dock? If you did that, and admittedly it takes much longer, but is that possible? So it's a case for damages and I frankly can't tell you the answer to the attorney's fee question as to all of the other costs, damages incurred, that would certainly be part of such a claim. Okay, other questions by either of my colleagues? Thank you counsel for your presentation. So Mr. Sparkman has some time. Just briefly, I'll address the point we were just talking about with respect to costs. And as we relied upon in our brief, this application of this local rule is in directly contrary to 28 U.S.C. 1920 and Federal Rules of Civil Procedure 54. It's also contrary and abuse of discretion to the actual local rule. And I just direct the court's attention to the fact that these types of costs shall only be allowed where same have been furnished by reason of express requirement of law, rule, or court order, none of which were present here. Now the argument has been made after the fact that well this LOU benefited the plaintiff because it allowed the vessel to be released immediately, you didn't incur additional custodial costs, oh by the way it would be less than an actual bond premium would have been, but that's all after the fact and something that didn't actually require this LOU to be posted. So your client is the one who insisted upon this ship's being arrested, right? Yes, Your Honor. So it just seems to me at that point it's, you know, you know what that carries with it. They're not going to want the ship to stay there for a year and a half. They're going to get it released by posting some form of security and the court is going to either approve or not approve that. But that's what happened here. Right, Your Honor, but one thing I would say to just distinguish and differentiate is that the only type of substitute security in the district, Western District of Washington, or in fact around the country, that a court can order a plaintiff to accept is either substitute cash into the registry of the court or a approved surety bond. Here the plaintiff took the lesser form of security in the attempt to work with the defendant. But it's a cost you foisted on the other side. You didn't have to do that. You wanted to protect the ability to recover if you were to prevail. You foisted that cost on the other side and you lost. There's nothing shocking about requiring your client to pay that, provided that there's some statutory authorization for it. So I just think your argument on that front is hopeless. Maybe you have an argument on the, this is just not an authorized cost, but the argument that somehow this is different in kind from the usual form of security posted. I just don't find that persuasive in the least. And the district judge expressly approved the letter of undertaking. Would it have been okay? He did approve the letter of undertaking, Your Honor, and that's one of the aspects of how these cases, there's generally a quid pro quo for the release of the rest and something else to be approved. At the time that the LOU was sought, agreed to, informed, and posted under the order of the court, there was absolutely no indication or knowledge by our client that opponents were taking out a loan or paying interest or anything else that they've subsequently sought by nature of this cost application, none of which is actually authorized by statutes and the Federal Rules of Civil Procedure. Did you oppose the court's order on the basis that it was not permitted by 1920? Yes, Your Honor. You did, at that time? Yes, Your Honor. We first made a motion to retax costs when the clerk ordered it and then filed subsequent briefing in response to opponent's argument. Okay, your time is up. Let me ask my colleagues, do either of you have any additional questions? Well, thank you, counsel. Thank you both. It's very helpful. As you might imagine, we don't have a lot of admiralty cases, but they're interesting, so thank you very much. The case just argued is submitted.
judges: M. Smith, Watford, Rayes